UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| COVENANT AVIATION SECURITY, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| GERALD L. BERRY, | ) ) |
| Defendant. | ) |

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

**COMMON ALLEGATIONS**

**Introduction and Summary**

1. Plaintiff Covenant Aviation Security, LLC brings this action for injunctive relief and damages against its former president Gerald L. Berry for breach of restrictive covenants and for misappropriation of confidential and proprietary information.

**Parties, Jurisdiction, and Venue**

2. Covenant is an Illinois limited liability company, and its sole member is an Illinois corporation with its principal place of business in Illinois. Covenant is engaged in the business of providing airport security services, including passenger screening, baggage screening, cargo screening, perimeter, access control and other aviation-related security services nationwide.

3. Berry is an individual and a citizen of the State of Florida. He was formerly President of Covenant for approximately ten years and subsequently worked for Covenant as a consultant. This lawsuit arises from contracts in which he consented to personal jurisdiction and venue in this district.

1

4. The amount in controversy exceeds $75,000 exclusive of interest and costs.

5. This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

**Covenant's Business and Experience in Airport Security**

7. Since 2002, Covenant has been in the business of providing airport security services including passenger screening, baggage screening, cargo screening, perimeter, access control and other related services throughout the United States.

8. The majority of Covenant's revenue is derived from contracts under the Screening Partnership Program ("SPP") with the United States Transportation Security Agency ("TSA").

9. SPP was created in 2004 at the conclusion of a pilot program that began in 2002 under Aviation Transportation Security Act of 2001. The program provides local airports with the option of having private companies, rather than TSA, perform passenger and baggage screening.

10. Since the beginning of the SPP program, only sixteen airports in the United States have opted to participate, and TSA has only awarded contracts to seven companies covering those airports. Among participating airports, San Francisco International Airport is by far the largest, with a passenger volume more than double that of all other participating airports combined. Only four companies besides Covenant currently hold SPP contracts.

11. Covenant has held the SPP contract for San Francisco continuously since the program began in 2002. Covenant won the initial contract in 2002 and was awarded successive contracts after rebids in 2006 and 2011. Covenant's current contract term for San Francisco expires September 30, 2013, and the TSA has two renewal options. TSA has announced its intention not to exercise renewal options and to place the contract out for bid, with a new

contract to take effect upon the expiration of the current term. Several competing companies are expected to bid for the new contract.

12. Screening at San Francisco is a complex, seven-day per week operation, with an annual contract value of approximately $95 million. No other company has performed such a large and complex screening operation.

13. In the more than ten years it has held the SPP contract in San Francisco, Covenant has developed expertise and know how in the performance of large and complex screening operations. This knowledge was developed at great effort and expense and is not available outside of Covenant. Covenant treats this information as highly confidential and takes reasonable precautions to protect it from unauthorized disclosure.

14. Information submitted in SPP proposals is exempt from disclosure under the Freedom of Information Act and does not become part of the public domain.

15. Covenant has also invested significant effort and expense developing information and know-how related to its other services that is not known outside the company and would be useful to competitors.

**Relationship of Berry to Covenant**

16. Berry was employed by Covenant as its President and signed an Executive Employment Agreement dated October 23, 2002 (Copy attached as Exhibit 1). Paragraph 7 of that agreement provided:

> **Non-Competition and Non-Disclosure.** Berry acknowledges that he has read and understands Covenant's Confidentiality and Restrictive Covenants Policies, which are included in this Agreement by this reference as though they were set forth in full herein, and that they are binding on Berry and agrees to comply with such policies in all respects.

17. Berry signed Confidentiality and Restrictive Covenants Policies dated October 23, 2002 (copy attached as Exhibit 2). Paragraph 5 of that document provided:

> **Non-Solicitation and Non-Competition.** During Fiduciary's engagement with the Company, and for one (1) year after the date on which Fiduciary's engagement terminates (the **"Restricted Period"**), Fiduciary shall
>
> **5.1.** not entice or induce, directly or indirectly, any employee or agent of the Company to leave such employment or engagement with the Company; and,
>
> **5.2.** before accepting other engagement or entering into a business relationship with any Competitive Business (a **"Successor Employer"**), cause written notice of the terms of these Policies (containing complete copies of the text hereof) to be delivered to such Successor Employer and within ten (10) days after such delivery, provide to the Company written acknowledgment from such Successor Employer of its receipt of such notice;
>
> **5.3.** not request, encourage or cause any existing Client of the Company to withdraw, curtail or cancel a business relationship with the Company;
>
> **5.4.** not solicit any potential Client for business if the potential Client was the subject of Fiduciary's sales or marketing activity directed toward the potential Client within twelve (12) months before termination of Fiduciary's engagement with the Company.

17. Berry also signed a Restrictive Covenant's Policy dated November 5, 2002 (copy attached as Exhibit 3) that provided:

> All confidential company information is the sole and exclusive property of CAS [Covenant] and all confidential Client information is the sole and exclusive property of the Client to which it relates.
>
> Employee agrees that Employee shall not, without prior written consent or direction of an officer or director of CAS, at any time during Employee's employment by CAS, or thereafter except to the extent required by law or court order or by the performance by Employee of his or her duties as an employee of CAS, use for the Employee's benefit or disclose to any other person any Confidential Information or upon leaving the employ of CAS take with Employee any Confidential Client Information.
>
> Upon termination of Employee's employment for any reason, or at any other time CAS requests in writing, Employee agrees immediately to deliver to CAS all

4

> physical records, originals, copies and compilations of or otherwise containing Confidential Information in Employee's possession or control.
>
> \*\*\*
>
> The specific "Confidential Information" any employee or terminated employee is prohibited to use or disclose is:
>
> 1. Bid/Cost Data and computation formulas;
> 2. Insurance and benefits cost formulas and payment premiums;
> 3. Identification of actual and prospective clients with whom CAS is holding discussions for specific work opportunities;
> 4. Client secrets, patents or trademarks, or other information sensitive or private to the client;
> 5. The appropriately marked restricted technical and cost portions of all bids and proposal previously submitted by CAS to include Executive Summaries, Introductions, restricted text/graphics/cost spreadsheets and marked restricted data within any submitted proposal;
> 6. Personal and/or sensitive information regarding any CAS employee with particular emphasis on salary/hourly wage rate, benefits, promotions, demotions, disciplinary actions, bonuses or other actions which are clearly the purview of the Human Resource Department.

18. Berry was President of Covenant from October, 2002 until July 1, 2012, when he became an independent consultant under the terms of a Consulting Agreement dated May 10, 2012 (copy attached as Exhibit 4). Paragraph 1 of the Consulting Agreement defined Berry's engagement as follows:

> **1. Engagement.** CAS engages Berry as an independent contractor to provide consulting services to promote SPP, encourage additional airports to opt out of TSA screening and to get the airports to choose CAS as their contractor for Airport Screening Services (the **"Services"**) and agrees to perform the Services as set forth in this Agreement.

Paragraph 7 of the Consulting Agreement provided:

7. **Confidential Information and Trade Secrets; Covenant Not to Compete.**

a. **Covenant Restrictive Covenant Policies.** Berry acknowledges that as a former CAS employee, he is still bound by the Covenant's Confidentiality and Restrictive Covenant's Policies, and agrees to comply with such policies in all respects. As long as such Policies are still applicable, if there is any conflict between any such policies and the terms and conditions found in this Agreement, then the terms and conditions of such policies will prevail.

b. **Confidentiality.** Berry acknowledges and agrees that: (a) in the course of Berry's activities under this Agreement, Berry and its personnel may be exposed to confidential and proprietary information of CAS, including, but not limited to, customer lists, pricing, methods, personnel charts and background information, forms, billings, competitive cost data, salaries and wages and other matters contained in internal documents and records and other trade secrets of CAS (**"Proprietary Information"); (b)** this information has been compiled or developed as a result of considerable expense and effort on the part of CAS and is valuable and is not generally known to people who can derive economic value from its use; (c) CAS makes efforts to maintain the secrecy or confidentiality of its Proprietary Information; and **(d)** Proprietary Information does not include any information that (i) is or becomes generally known to the public, **(ii)** is intentionally and not inadvertently disclosed by CAS to other persons who are its agents or independent contractors without reservation of confidentiality, or **(iii)** becomes available to Berry from another source, and Berry reasonably believes that such source obtained such information without violation of a duty of confidentiality between any such source and CAS. All Proprietary Information, know-how or trade secrets created by Berry, or to which Berry has contributed, that relate to the scope of Berry's Services and other activities on behalf or in service of CAS or were made during Berry's engagement will be deemed to be CAS' Proprietary Information pursuant to this Agreement.

c. **CAS Property; Rights of Clients.** All Proprietary information is the sole and exclusive property of CAS, and all confidential client information is the sole and exclusive property of the client to which it relates.

d. **Non-Disclosure. Berry** will not at any time, whether during the term of Berry's engagement under this Agreement or thereafter, without the express written consent of CAS, (a) disclose any Proprietary Information to any other person or entity or (b) use any Proprietary Information directly or indirectly for Berry's own benefit or for the benefit of any person or entity other than CAS. All documents, records or other items containing any Proprietary Information will at all times be the property of CAS, and Berry will not copy nor take any such items from CAS'

premises by Berry without the express consent of CAS.

    e.    **Work for Hire.** Berry agrees that all documents, supporting notes, working papers, drafts and other writings whether on paper or disk, electronic medium, or any other form or medium, including all copies thereof (**"Berry's Works"**) prepared and/or developed by Berry in the course of rendering the Services are the exclusive property of CAS. Upon termination of this Agreement or upon the request of CAS at any time, Berry will turn over to CAS all originals and copies of Berry's Works.

    f.    **Non-Solicitation.** During the term of this Agreement and for one (1) year after termination of Berry's engagement under this Agreement or of any other service by Berry to CAS whatsoever, whichever is later (the **"Restricted Period"**)**,** Berry will not **(i)** knowingly entice or induce, directly or indirectly, any officer, director, employee or other agent ("**Agent**") of CAS to leave such agent's engagement with the Company, **(ii)** solicit any Existing or Potential Customer on behalf of any other person or entity offering Airport Screening Services, or **(iii)** request, encourage or cause any Existing or Potential Customer to withdraw, curtail or cancel a business relationship with CAS. "**Existing**" and "**Potential Customers**" of CAS mean both the TSA and each municipal authority or agency that has control or contractual authority with respect to the applicable airport and are used with respect to any airport where CAS has utilized Berry's Services in order to develop, solicit and/or implement any contract for Airport Screening Services within the last two (2) years of Berry's engagement with CAS.

19. As President of Covenant, Berry had complete operational and profit/loss responsibility for the company's activities throughout the country. He was intimately involved in all aspects of Covenant's business and had complete access to all of Covenant's confidential and proprietary information. This confidential and proprietary information included, but was not limited to, profit and loss information, internal costs and overhead, operational information related to San Francisco and other facilities throughout the country, and specific bid and proposal information related to San Francisco and other airports.

**Breach of the Consulting Agreement and Termination for Cause**

20. In July 2012, Berry formed a company known as Berry Transportation Security, LLC with the intention of competing with Covenant for SPP projects and other work. Berry concealed the existence of that company from Covenant. By forming that company and concealing its existence from Covenant, Berry committed a material breach of the Consulting Agreement.

21. In addition, Berry failed to meet specific goals outlined in paragraph 4 of the Consulting Agreement and did not make a good faith effort to work in close cooperation with Covenant's board of directors as required by paragraph 6.

22. Upon learning of Berry's breaches, Covenant's board terminated the Consulting Agreement. Berry was informed of his termination by two letters that were personally delivered to him by Covenant's Chief Executive Officer on October 11, 2012. Copies of those letters are attached as Exhibits 5 and 6. Berry was informed that Covenant would pursue all available remedies if he breached the restrictions and covenants to which he had previously agreed.

**Berry's Subsequent Activities in Violation of His Agreements**

23. After termination of the Consulting Agreement, Berry became affiliated with American Homeland Security ("AHS"). AHS is a small security company with no previous experience in SPP or other airport security. Before affiliating with Berry, AHS did not hold itself out as offering airport security services of any kind. The website of AHS archived as of August 27, 2012 (copy attached as Exhibit 7) did not mention airport security among the services offered.

8

24. After affiliating with Berry, AHS began marketing itself as having expertise in a SPP and other airport security services. A more recent version of the website (copy attached as Exhibit 8) described the services offered by AHS and boasted that AHS "can provide unsurpassed private company screening services to American's airports." AHS did not claim to have this expertise before its affiliation with Berry.

25. AHS was incapable of developing the expertise in SPP and other airport security it claims to have on its own. Upon information and belief, Berry has provided Covenant's confidential and proprietary information to AHS in an effort to compete for SPP and other airport security work, either directly or as a teaming partner with other, larger companies.

26. Upon information and belief, Berry has communicated directly with one or more other competitors of Covenant, including HSS, Inc., Firstline Security, Securitas, and Pinkerton and has provided, or offered to provide, confidential and proprietary information that would be useful in competing for the forthcoming rebid of the SPP contract for San Francisco and for various security services at other airports..

## COUNT I
## BREACH OF RESTRICTIVE COVENANTS AND
## CONFIDENTIALITY AGREEMENTS

1–26. Covenant realleges and incorporates by reference the allegations of paragraphs 1 through 26 of the Common Allegations.

27. Covenant has a legitimate business interest in protecting its confidential and proprietary information, as well as its long-term customer relationship at San Francisco Airport and its relationships with other customers and potential customers.

9

28. The restrictions in Berry's agreements with Covenant are reasonably necessary to protect Covenant's business interests.

29. The restrictions do not impose an undue hardship upon Berry. The market for security services includes thousands of potential customers. The number of SPP airports and other airports where Covenant has provided services or that were current or planned targets of Covenant's marketing activities during Berry's tenure is a small fraction of those markets.

30. By providing and offering to provide Covenant's confidential and proprietary information to competitors, Berry has breached his agreements with Covenant.

31. If Berry's violations continue, Covenant will suffer irreparable harm for which it will have no adequate remedy at law. In addition, Covenant will incur damages, the amount of which is not presently known but which will be determined in discovery and proved at trial.

WHEREFORE, Covenant requests a judgment in its favor enjoined Berry from using or disclosing its confidential and proprietary information or otherwise breaching the restrictions in his agreements and that Covenant be awarded damages in the amount proved at trial as well as its costs of this action and all other appropriate relief.

## COUNT II
## ILLINOIS TRADE SECRET ACT

1–26. Covenant realleges and incorporates by reference paragraphs 1 through 25 of the Common Allegations.

27. Covenant's confidential and proprietary information is a trade secret within the meaning of 765 ILCS § 1065/2(d).

28. Upon information and belief, Berry has disclosed Covenant's confidential and proprietary information to AHS and others and is using that information to compete unfairly with Covenant.

29. The conduct described above constitutes misappropriation as that term is defined by 765 ILCS § 1065(b)(b).

30. Covenant is entitled to an injunction against the use or disclosure of its trade secrets by Berry.

31. Covenant is entitled to damages for misappropriation as provided by 765 ILCS § 1065/5.

WHEREFORE, Covenant requests that the Court enter an injunction against the use or disclosure of its trade secrets by Berry, for compensatory damages in the amount proved at trial, for reasonable attorneys' fees, for costs of this action, and for all other appropriate relief.

## COUNT III
## BREACH OF FIDUCIARY DUTY

1–26. Covenant re-alleges and incorporates by reference paragraphs 1 through 25 of the Common Allegations.

27. As President of Covenant, Berry was under a fiduciary duty not to use information acquired during the relationship for his own personal benefit or in a manner detrimental to Covenant. That duty remains in effect with respect to information Berry acquired as Covenant's President.

28. By the conduct described above Berry, has used and continues to use Covenant's

information in breach of his fiduciary duty.

29. Covenant is entitled to damages incurred as a result of Berry's breach of his fiduciary duty as well as injunctive relief against Berry's future use information he acquired as President of Covenant.

WHEREFORE, Covenant requests that the Court enter an injunction against Berry's use or disclosure of information he acquired a President of Covenant, for damages in the amount proved at trial, for costs of this action, and for all other appropriate relief.

                **COVENANT AVIATION
                SECURITY, LLC**

            **By    /s/ James E. Mahoney**

**GRIFFITH & JACOBSON, LLC
55 W. Monroe, Suite 3550
Chicago, Illinois 60603
312-236-8110
jem@gjlaw.com
ARDC No. 6195391
Attorneys for Covenant Aviation
Security, LLC**